## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WESLEY ASKEW, SR.,** | : | **CIVIL ACTION NO. 1:04-CV-0631** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **DONALD L. KELCHNER, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This is a § 1983 action filed by William Askew, Sr. ("Askew"), a former

prisoner in the Pennsylvania State Correctional Institution at Camp Hill ("SCI-

Camp Hill").  Presently before the court is the motion for summary judgment

(Doc. 28), filed by defendants Christopher Chambers ("Chambers") and Jennifer

Hendricks ("Hendricks"),[1] both of whom are employees of the Pennsylvania

Department of Corrections ("Department").  (<u>See</u> Doc. 20 at 4.)  For the reasons that

follow, the motion will be granted.

---

[1] The parties stipulated to the dismissal of defendant Donald L. Kelchner
from the above-captioned action pursuant to Rule 41(a)(1) of the Federal Rules of
Civil Procedure.  (<u>See</u> Doc. 27.)

I.   **Statement of Facts**[2]

The gravamen of Askew's argument is that defendants violated his Eighth

Amendment right to be free from cruel and unusual punishment by unlawfully

detaining him beyond his maximum sentence.[3]  (See Doc. 32 at 6.)  Specifically,

Askew alleges that:  (1) Chambers improperly calculated his release date, and

(2) Chambers' improper calculation resulted, at least in part, from his reliance on a

Department policy that had been implemented by Hendricks.

   A.   **The Defendants**

From 1993 to 1996, Chambers was employed as a records specialist for the

Department.[4]  (Doc. 31-2 at 113.)  As a records specialist, Chambers would receive a

DC-300B form for each inmate who entered the Pennsylvania prison system.  (Id. at

119-20.)  A DC-300B form, which is forwarded to the prison from the sentencing

court, is a court commitment document that includes the prisoner's sentence

computation.[5]  Upon receiving the form, it was Chambers' responsibility to

---

[2] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to plaintiff, the non-moving party.  See infra Part II.

[3] Askew has chosen to withdraw his state tort claim of false imprisonment, given defendants' assertion of sovereign immunity.  (See Doc. 33 at 1 n.2; Doc. 37-1 at 2.)

[4] In 1996, Chambers accepted a position as a corrections counselor, which he still holds today.  (Doc. 31-2 at 116.)

[5] See JEFFREY A. BEARD, PA. DEP'T OF CORRS., POLICY STATEMENT ON RECORDS OFFICE OPERATIONS 8 (July 16, 2003), http://www.cor.state.pa.us/ standards/lib/standards/11.05.01_Records_Office_Operation.pdf.

calculate each inmate's minimum and maximum release dates in accordance with the sentencing instructions on the DC-300B.  (Id. at 119-20.)  If pre-commitment credit was granted by the sentencing court, Chambers would take that information into account when determining the prisoner's correct minimum and maximum terms of incarceration and would then transfer that information to a DC-16 sentence status summary form.  (Id.)

Beginning in 1997, Hendricks was employed as the records coordinator for the Department's central office in Camp Hill.  (Id. at 66-67, 89.)  As records coordinator, Hendricks was responsible for developing and implementing administrative policies to ensure that the Department performed sentence computations appropriately.  (Id. at 95-96; Doc. 41 ¶ 3.)  One such policy directed records specialists to conclude that an inmate's pre-commitment credit was zero unless an amount for pre-commitment credit had been specified on a court commitment document, such as a sentencing order or DC-300B [hereinafter "zero credit policy"].[6]  (Doc. 31-2 at 103-04.)

**B.    Askew's Sentence**

On June 21, 1994, the Court of Common Pleas of Luzerne County sentenced Askew to a term of imprisonment of five to ten years with "credit for time served." (Doc. 34 at 1.)  On July 13, 1994, Askew was received as a prisoner at SCI-Camp Hill. (Doc. 31 ¶ 7; Doc. 41 ¶ 7.)  On the same day, the Luzerne County Clerk's office

---

[6] Hendricks acknowledged that this policy could result in some inmates being imprisoned beyond their maximum sentences.  (Doc. 41 ¶ 14.)

3

completed a DC-300B form to be sent to SCI-Camp Hill.  The DC-300B did not

specify an amount of pre-commitment credit to be awarded.  (Doc. 31-2 at 29-30.)

Instead, written in the section regarding pre-commitment credit was the phrase

"credit for time served."  (<u>Id.</u> at 29-30.)  In addition to the DC-300B, Chambers

requested and received a copy of Askew's pre-sentence investigation report, which

indicated that Askew was entitled to 330 days of pre-commitment credit.  (Doc. 33 at

7; Doc. 34-5 at 1.)  Askew concedes that the pre-sentence investigation report was

not a court commitment document.  (<u>See</u> Doc. 41 at 3.)

Utilizing solely the DC-300B, Chambers computed Askew's sentence without

including any pre-commitment credit and transferred that information to a DC-16

sentence status summary form.  (Doc. 31-2 at 103-04.)  Because the pre-sentence

investigation report was not a court commitment document, Chambers' decision

not to rely upon it was in compliance with the zero credit policy as implemented by

Hendricks.  (Doc. 34 ¶ 34; Doc. 37 ¶ 34.)

During 1996, Askew received a copy of his DC-16 sentence status summary

form and voiced his concern to Chambers that he believed he was entitled to pre-

commitment credit.  (Doc. 33 at 3.)  When Askew notified Chambers of his concern,

Chambers was no longer a records specialist; he had accepted a position as a

corrections counselor.  (Doc. 31-2 at 116.)  As a result, Chambers took no action to

investigate Askew's concerns, and Askew served 151 days beyond his maximum

term of imprisonment.[7]  (Doc. 20 at 4.)

### C.    Procedural History

On March 24, 2004, Askew filed the instant action, alleging that defendants

violated his Eighth Amendment rights by improperly calculating his maximum

sentence.  (Doc. 1.)  On July 18, 2005, Askew filed an amended complaint.  (Doc. 20.)

Thereafter, defendants filed the instant motion for summary judgment (Doc. 28),

alleging, *inter alia*, that the doctrine of qualified immunity shields them from

liability.  (See Doc. 32 at 19-22.)  The motion has been fully briefed and is ripe for

disposition.

## II.    Standard of Review

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact," and for which a jury trial

would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places

the burden on the non-moving party to adduce "affirmative evidence, beyond the

allegations of the pleadings," in support of its right to relief.  Pappas v. City of

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

---

[7] In 2003, Askew filed a petition for writ of habeas corpus with the Luzerne
County Court of Common Pleas.  (Doc. 41 ¶ 12.)  He was released after the court
certified the amount of pre-commitment credit to which he was entitled and
determined that he had served longer than his maximum sentence.  (Id.)

on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see

also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   Discussion

Section 1983 of Title 42 of the United States Code offers private citizens a

means to redress violations of federal law committed by state officials.  See

42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

Id.  Section 1983 is not a source of substantive rights, but merely a method for

vindicating violations of other federal laws.  Gonzaga Univ. v. Doe, 536 U.S. 273,

284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish a

claim under this section, a plaintiff must show a deprivation of a "right secured by

the Constitution and the laws of the United States . . . by a person acting under

color of state law."[8]  Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141

(3d Cir. 1995)).

---

[8] Defendants apparently do not dispute that, during the alleged incidents,
they were "acting under color of state law."

6

Satisfaction of these elements, however, does not guarantee recovery. Certain officials, including state actors who perform "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Saucier v. Katz, 533 U.S. 194, 200-01 (2001); Wilson v. Layne, 526 U.S. 603, 609 (1999). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." Hunter v. Bryant, 502 U.S. 224, 227 (1991); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). In Saucier, the Supreme Court explained the analytical process for determining when to apply the privilege of qualified immunity:

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right? This must be the initial inquiry . . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

Saucier, 533 U.S. at 201. Thus, the qualified immunity analysis requires a two-step inquiry.

> First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right. If so, the court must then determine whether the constitutional or statutory right allegedly violated by the defendant was "clearly established." If the court concludes that the defendant's conduct did violate a clearly established constitutional or statutory right, then it must deny the defendant the protection afforded by qualified immunity.

Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006); cf. Wright v. City of Phila., 409 F.3d 595 (3d Cir. 2005) (discussing whether the constitutional violation is a separate inquiry or part of the qualified immunity analysis); Kaucher v. County of Bucks, 455 F.3d 418, 423 n.2 (3d Cir. 2006).

When immunity is raised at the summary judgment stage, the court's analysis of the merits of the claims for purposes of summary judgment essentially merges with its analysis of the existence of a deprivation of federal rights for purposes of immunity.  See Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Russoli v. Salisbury Twp., 126 F. Supp. 2d 821, 838-41 (E.D. Pa. 2000); see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").  Proceeding under this framework, the court will examine Askew's claim to determine, first whether he has alleged sufficient evidence of a deprivation of a constitutional right and, second, whether the right at issue was clearly established.

A.     **Was Askew Deprived of a Constitutional Right?**

In the action *sub judice*, the sole issue presented is whether Askew's

detention beyond his term of imprisonment violated the Eight Amendment.[9]  The

Eighth Amendment proscribes the infliction of cruel and unusual punishment.  U.S.

CONST. amend VIII.  To determine whether Askew's detention beyond his period of

imprisonment violated the Eighth Amendment, this court must consider whether

Askew's continued detention was "punishment" and, if so, whether that

punishment was "cruel and unusual."  See Sample v. Diecks, 885 F.2d 1099, 1107-08

(3d Cir. 1989).

1.     **Punishment**

Turning first to the issue of punishment, it is clear that imprisonment beyond

one's term of incarceration is punitive within the meaning of the Eighth

Amendment.  Id. at 1108 ("[T]here can be no doubt that imprisonment beyond one's

term constitutes punishment within the meaning of the [E]ighth [A]mendment.");

see also Hutto v. Finney, 437 U.S. 678, 685 (1978) (stating that imprisonment is a

form of punishment under the Eighth Amendment).  Examining the facts in the

light most favorable to plaintiff, Askew was to receive 330 days of pre-commitment

credit.  Ultimately, defendants' failure to properly apply this credit resulted in

---

[9] The right be free from cruel and unusual punishment also implicates the
protections of the Fourteenth Amendment.  See Bieregu v. Reno, 59 F.3d 1445,
1452-54 (3d Cir. 1995).  Because the basis of the right does not alter the
constitutional analysis, see id., the court will discuss this issue in the Eighth
Amendment context.

Askew spending 151 days in confinement beyond his maximum sentence.  Such continued confinement is punitive within the meaning of the Eighth Amendment. The fact that Askew's continued confinement was inadvertent does not alter the confinement's punitive nature, although it may affect whether the confinement was cruel and unusual.  See Sample, 885 F.2d at 1108.

## 2.   **Cruel and Unusual**

Punishment cross the Rubicon of the Eighth Amendment prohibition of "cruel and unusual" punishment when it causes the unnecessary and wanton infliction of pain or is grossly disproportionate to the severity of the crime.  See Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Sample, 885 F.2d at 1108.  In the prison context, a punishment is considered "unnecessary and wanton" if it is imposed on an inmate "without penological justification."  See id. (quoting Rhodes v. Chapman, 452 U.S. 337, 346 (1981)).

Harm to an inmate may be penologically justified if that harm results from the types of unavoidable or inadvertent errors that are a necessary cost of administration of the prison system.  Sample, 885 F.2d at 1108-09.  It cannot reasonably be disputed that the elimination of all errors within the prison system is "either literally impossible or unfeasible because prohibitively costly."  Id. at 1108. Consequently, harms to inmates that result from unforeseeable or inadvertent mistakes are neither "repugnant to the conscience of mankind" nor violative of the Eighth Amendment.  Id. at 1108-09 (citing Estelle v. Gamble, 429 U.S. 97, 105 (1976)).

It is, therefore, Askew's responsibility to demonstrate that his prolonged detention did not result from such an unforeseeable or inadvertent mistake.

To establish that a prison official's improper sentence calculation violated the Eighth Amendment, the inmate must demonstrate that:  (1) the prison official "had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted," (2) the prison official "either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference[10] to the prisoner's plight," and (3) a causal connection existed "between the official's response to the problem and the infliction of the unjustified detention."  Sample, 885 F.2d at 1110. Even a cursory examination of the facts reveals that defendants' actions or inactions were a cause of Askew's harm.  (See Doc. 33 at 7; Doc. 34-5 at 1.)  Accordingly, the court need only address the first two elements.

--------

[10] The degree to which a harm is justified by the "exigencies of prison administration" determines the requisite state-of-mind a prison official must exhibit to violate the Eighth Amendment.  Sample, 885 F.2d at 1109.  In high pressure situations that have an immediate impact on prison security, a prison official may be held liable under the Eighth Amendment if he or she failed to act in "good faith." Whitley v. Albers, 475 U.S. 312, 320 (1986) (applying good faith standard to decisions made during prison riot).  In more routine situations in which the potential harm to prison administration is limited, a prison official may be held liable if he or she acted with "deliberate indifference" to the rights of an inmate.  Estelle, 429 U.S. at 104 (applying deliberate indifference standard to the provision of medical care to an inmate).  Calculating an inmate's maximum sentence falls in the latter category because the risks of harm to prison administration are slight.  See Sample, 885 F.2d at 1109 ("Where an official with a duty to investigate, check, or report is notified of a problem, the cost of his either rectifying the problem himself or reporting the problem to higher authorities will not compete with other aspects of administering the penal system.")

a.    **Notice**

With respect to Askew's claims against Hendricks, the court finds that

Hendricks' deposition testimony establishes that she had notice of Askew's plight.

In her deposition, Hendricks testified as follows:

> Q.  And I think you would agree that with regards to that process that
> you just agreed to which is followed by the DOC [the zero credit
> policy], that that can result in holding of an inmate beyond his legal
> maximum sentence?
>
> A.  Yeah.

(Doc. 33 at 18.)  Examined in the light most favorable to Askew, Hendricks was

adequately notified that implementation of the zero credit policy would result in

individuals, such as Askew, being detained beyond their terms of imprisonment.

Askew's claims against Chambers require a more thorough analysis.  Askew

argues that Chambers was notified of his plight in two ways.  First, Askew avers

that the pre-sentence investigation report sufficiently alerted Chambers to Askew's

330 days of pre-commitment credit.  Second, Askew argues that his oral statement

to Chambers regarding the alleged sentencing error placed Chambers on notice of

his prolonged incarceration.

Turning first to the pre-sentence investigation report, Askew argues that the

report's recommendation that 330 days of pre-commitment credit be awarded put

Chambers on notice that Askew's sentence calculation was erroneous.  The

Pennsylvania legislature has allocated the power to determine whether pre-

commitment credit should be awarded solely to the sentencing court.[11]  See 42 PA.
CONS. STAT. ANN. § 9760; see also Freeman v. Martinez, No. Civ. 304-CV-1226, 2005
WL 1309023, at *3 (M.D. Pa. 2005).  Department employees lack the power to add or
delete sentencing conditions imposed by the sentencing court.  McCray v. Pa. Dep't
of Corrs., 872 A.2d 1127, 1333 (Pa. 2003).  Because the sentencing court is the entity
empowered to award pre-commitment credit, only court commitment documents,
like the DC-300B, notify a prison official of his duty to rectify.  In the instant action,
the DC-300B did not provide a pre-commitment credit amount.  Instead, the DC-
300B stated simply "credit for time served."  Imputing to Chambers the
responsibility for determining the amount of pre-commitment credit would usurp
the statutory obligations of the sentencing court.  See id. at 1333; Detar v. Beard,
898 A.2d 26, 30-31 (Pa. Commw. Ct. 2006) ("[Department of Corrections] is not an
adjudicative body.  Rather, it is an executive branch agency charged with fully
implementing the sentences imposed by the courts.").  Accordingly, the
recommendations of the pre-sentence investigation report were insufficient to
notify Chambers of actual pre-commitment credit due Askew.

Askew also argues that his oral statement constituted sufficient notice to
Chambers of his unwarranted detention.  Askew analogizes the facts of his case to
those of Sample, where the plaintiff, an inmate, notified the defendant, a senior

---

[11] While it is true that prison officials have a duty to apply any pre-
commitment credit awarded by the sentencing court,  see 42 PA. CONS. STAT. ANN.
§ 9760, a prison official is not adequately notified of an inmate's plight unless the
sentencing court has specifically awarded pre-commitment credit.

records officer, of an error regarding his sentencing computation. <u>Id.</u> at 1104.  In

<u>Sample</u>, the defendant admitted that he knew that the plaintiff's murder conviction

had been overturned and that, as a result, there was credible evidence that the

plaintiff was no longer justly imprisoned.  After receiving notification of the

plaintiff's possible prolonged incarceration, the records officer failed to rectify the

problem or to notify the appropriate officials.  The court held that the defendant

was liable for violating the plaintiff's right to be free from cruel and unusual

punishment.

In the instant action, Askew placed Chambers on notice of a mistake

concerning his sentence computation, but the similarities with <u>Sample</u> extend no

further.  In <u>Sample</u>, the plaintiff corroborated his assertion with evidence regarding

his overturned murder conviction.  <u>Sample</u>, 885 F.2d at 1104.  It was this credible

evidence that the <u>Sample</u> court found sufficient to trigger the defendant's duty to

rectify the problem.  <u>See</u> <u>Moore v. Tartler</u>, 986 F.2d 682, 686-87 (3d Cir. 1993) (citing

cases requiring credible evidence to sufficiently notify prison officials of a prisoner's

plight).  Here, Askew did nothing more than alert Chambers that he personally

believed his sentence computation was erroneous.  Askew offered no credible

evidence to corroborate his assertion.  Such an allegation is insufficient to

reasonably notify Chambers of a credible harm to Askew.  If this court were to

adopt Askew's argument, an inmate could effectively preserve a valid Eighth

Amendment claim merely by mentioning a concern regarding his sentence to the

appropriate official.  Taken to its logical conclusion, Askew's argument would

impose on prison officials a duty to investigate every verbal complaint of unlawful detention; it is hardly speculation to suggest that the number of such complaints would be overwhelming to prison administrators.  Absent the requirement of credible corroborating evidence, an investigation that once had only a slight cost to prison administration would become cost prohibitive.  See Sample, 885 F.2d at 1109 (stating that the cost to prison administration of requiring records officials to rectify alleged sentence computation errors is slight).  Therefore, the court concludes that Chambers was not on notice of Askew's sentence error and is shielded from liability pursuant to the doctrine of qualified immunity.

### b. **Deliberate Indifference**

Examining the facts in the light most favorable to Askew, the court finds sufficient evidence for a reasonable jury to conclude that Hendricks acted with deliberate indifference.  Hendricks stated that she knew that continued implementation of the zero credit policy could result in situations in which prisoners would be unlawfully detained beyond their terms of imprisonment. (Doc. 33 at 18.)  This statement demonstrates that Hendricks had actual knowledge of the fact that prisoners could be subjected to imprisonment without penological justification; and her failure to correct this problem could constitute deliberate indifference.

In the exercise of caution, the court notes that Chambers did not act with deliberate indifference to Askew's constitutional rights because of the change in Chambers' job responsibilities after Askew was sentenced.  To determine whether a

prison official acted with deliberate indifference to an inmate's rights, the court must consider "the scope of the official's duties." <u>Sample</u>, 885 F.2d at 1110. "[I]f a prison official knows that, given his or her job description or the role he or she has assumed in the administration of the prison, a sentence calculation problem will not likely be resolved unless he or she addresses it or refers it to others, it is far more likely that" the prison official acted with deliberate indifference. <u>Id.</u> In the action *sub judice*, when Askew notified Chambers of his concerns, Chambers was no longer a records specialist. Chambers had accepted a position as a corrections counselor. (Doc. 31-2 at 116.) Askew concedes that he was aware of Chambers' new position when he notified Chambers regarding the sentence computation error. (<u>See</u> Doc. 31-2 at 44.) While the court does not condone Chambers' inaction, the court finds that, given his transfer to a new position, his conduct does not amount to the type of "highly unreasonable conduct or . . . gross departure from ordinary care" necessary to constitute deliberate indifference. <u>See</u> <u>Moore</u>, 986 F.2d at 686 (citing <u>Haygood v. Younger</u> 769 F.2d 1350 (9th Cir. 1985), for the proposition that mere negligent conduct is insufficient to impose liability).

**B.    <u>Was That Right Clearly Established?</u>**

To be "clearly established" in the context of a qualified immunity analysis, "[t]he contours of [the] right must be sufficiently clear that a reasonable official would understand that what [he or she] is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of

16

pre-existing law the unlawfulness must be apparent." <u>Bruenke v. Seip</u>, 225 F.3d 290, 299 (3d Cir. 2000) (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

Askew argues that Hendricks is liable for continued implementation of the zero credit policy. Hendricks admittedly knew that, under such a policy, inmates could be subjected to penologically unjustified imprisonment. However, knowledge that one's actions or inactions may result in possible constitutional violations is not determinative of whether a right is clearly established. <u>See</u> <u>Anderson</u>, 483 U.S. at 643 (stating that, in essence, it is possible for one's actions to be "reasonably unreasonable"). This principle has been further evidenced by the extension of qualified immunity to officials whose reasonable actions led to violations of the Fourth Amendment. <u>See</u> <u>Malley v. Briggs</u>, 477 U.S. 335 (1986) (holding that an officer is not liable for an unconstitutional arrest so long as the officer reasonably believed the facts alleged in the affidavit used to obtain a warrant were true); <u>Mithcell v. Forsyth</u>, 472 U.S. 511 (1985) (holding that the Attorney General was entitled to qualified immunity from suit for a warrantless wiretap).

The court finds sufficient evidence to suggest that Hendricks could have reasonably concluded that continued application of the zero credit policy did not violate a clearly established constitutional right. Section 9760 of Title 42 of the Pennsylvania Consolidated Statutes and <u>McCray v. Pa. Dep't of Corrs.</u>, 872 A.2d 1127 (Pa. 2003) provide an objectively reasonable foundation for Hendricks' continued application of the zero credit policy. Section 9760 states, "After reviewing the information submitted under section 9737 . . . *the court* shall give

17

credit as follows . . . ."  See 42 PA. CONS. STAT. ANN. § 9760 (emphasis added).

Section 9760 could reasonably be read to indicate that the responsibility to

determine pre-commitment credit lies solely with the sentencing court and not with

the Department.   Moreover, McCray states that Department employees lack the

power to add sentencing conditions.  McCray, 872 A.2d at 1333.  If a sentencing

order or DC-300B does not specify an amount of pre-commitment credit to be

awarded, it would certainly be reasonable to interpret McCray to forbid a prison

official, such as Hendricks, from exercising her discretion to effect such an award.

Concomitantly, the court finds that the zero credit policy itself is objectively

reasonable.  The significant criminal justice interests in preserving judicial

authority over sentencing determinations is obvious.  Likewise, the court finds that

it was objectively reasonable for Hendricks to anticipate that inadvertent errors in

sentence calculations would result from the zero credit policy and to conclude that

such errors are a necessary cost of the safe and efficient administration of the

prison system.  (Doc. 33 at 18); see Quarles v. C. De La Cuesta, No. CIV. A. 92-5928,

1993 WL 86460, at *2 (E.D. Pa. 1993) ("Inadvertent or negligent mistakes do not

constitute cruel and unusual punishment."); cf. Muslim v. Frame, 854 F.Supp. 1215,

1224 (E.D. Pa. 1994) ("[I]n prison, religious practices are subject to reasonable

restrictions to preserve order and safety.").  In this case, the responsibility for

determining the pre-commitment credit rested with the sentencing court;

responsibility for the inadvertent error that led to Askew's prolonged detention also

rests with the sentencing court.

18

In light of the foregoing, the court finds that it was objectively reasonable for Hendricks to conclude that continued application of the zero credit policy would not violate a clearly established constitutional right.[12]  Accordingly, Hendricks is entitled to qualified immunity, and her motion for summary judgment will be granted.

IV.    <u>Conclusion</u>

For the foregoing reasons, defendants' motion for summary judgment (Doc. 28) will be granted.  An appropriate order will issue.

 S/ Christopher C. Conner    <br>
CHRISTOPHER C. CONNER<br>
United States District Judge

Dated:       March 7, 2007

---

[12] Assuming *arguendo* that Chambers' conduct violated Askew's Eighth Amendment rights, the court finds that it would have been objectively reasonable for Chambers to conclude that he had no duty to investigate a sentence computation error that resulted from the application of the zero credit policy.  <u>See</u> 42 PA. CONS. STAT. ANN. § 9760; <u>McCray</u>, 872 A.2d at 1333.  The policy's objective reasonableness is sufficient to entitle Chambers to qualified immunity.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WESLEY ASKEW, SR.,** | : | **CIVIL ACTION NO. 1:04-CV-0631** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JENNIFER HENDRICKS, and** | : | |
| **CHRISTOPHER CHAMBERS,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 7th day of March, 2007, upon consideration of defendants'

motion for summary judgment (Doc. 28), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1.   The motion for summary judgment (Doc. 28) is GRANTED.

2.   The Clerk of Court is directed to enter JUDGMENT against plaintiff
     and in favor of defendants Jennifer Hendricks and Christopher
     Chambers.

3.   The Clerk of Court is directed to CLOSE this case.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge